**MOUNT PLEASANT INDEPENDENT SCHOOL DISTRICT et al., Petitioners,**

v.

**ESTATE OF Misty Dawn Steck LINDBURG By and Through its Administratrix, Saundra LINDBURG et al., Respondents.**

No. C–7379.

Supreme Court of Texas.

Feb. 15, 1989.

Rehearing Denied March 29, 1989.

Robert W. Weber and John R. Mercy, Atchley, Russell, Waldrop & Hlavinka, Texarkana, for petitioners.

Randell C. Roberts and Bruce L. Roberts, Loftis & Roberts, Tyler, for respondents.

SPEARS, Justice.

At issue in this case is the standard of care imposed upon a school district to ensure a student's safety after disembarking a district provided school bus, and the limits of the legislature's waiver of sovereign immunity. The trial court held the district owed a duty of ordinary care to its student passengers and that the doctrine of sovereign immunity did not protect the school district from suit. The court of appeals reversed, holding that the school district owed a high degree of care to its student passengers, similar to the duty owed by common carriers. 746 S.W.2d 257 (Tex. App.—Texarkana 1987). That court further held the school district waived its claim of sovereign immunity by failing to obtain a trial court ruling on the issue. 746 S.W.2d at 260. We reverse the judgment of the court of appeals and render judgment that plaintiffs take nothing.

Misty Lindburg, a seven-year-old, third-grade student, lived in the Northtown East mobile home park on the west side of U.S. Highway 271 in Mount Pleasant, Texas. Misty often rode the bus home from school and got off on the east side of Highway 271 near the southernmost entrance to the park. The bus also stopped about forty yards north of this entrance near the home of Jason Hinton, a student, and roughly across the highway from a northern entrance to the trailer park. Misty occasionally got off the bus at this stop to pick up her little sister from a nearby neighbor in the mobile home park. This neighbor sometimes watched the younger sister, and it was Misty's chore to take the child home and wake her mother.

The bus Misty rode was driven by John Gullion, a Special Education teacher. Gullion had fifteen years of experience as a bus driver and had initially taken a thirty-hour certification course. Every three years thereafter he had taken a ten-hour refresher course to remain certified. The Mount Pleasant Independent School District also provided a safety program for school bus drivers at the beginning of each school year.

Gullion was responsible for driving approximately 175 students to and from school in the fall semester of 1984. He testified that the local bus safety rules required each child to exit the bus at the same stop from which the child had been picked up. The child was not supposed to get off at a different stop in the afternoon unless he had a note from the principal or his parents. Gullion described this procedure but explained that knowing where 175 children get on and off was a difficult, if not impossible, task because of the constantly changing demographics of the bus route. He had been driving Misty only six

weeks and testified that he did not yet know where she lived.

On October 18, 1984 Gullion was transporting many students, including Misty, to the bus stops near their homes. He stopped the bus at the southernmost entrance to the mobile home park and checked to see that traffic in both directions had stopped. He then opened the bus doors, and six to eight children exited, walked to the front of the bus and safely crossed the highway.

Gullion then drove approximately forty yards north to a bus stop near the home of Jason Hinton. This stop was across Highway 271 from the northern entrance to the mobile home park in which Misty lived. Again Gullion made sure that all traffic had stopped and then opened the bus's doors. Misty Lindburg and Jason Hinton exited the bus at this stop. Hinton walked directly to his home. Misty exited and walked away from the bus into the grass on the east side of the highway. There was testimony that she then bent down and tied her shoe. Another witness testified that Misty appeared to be talking to Jason after she exited the bus. Gullion waited a sufficient length of time to allow Misty to cross the highway although she did not appear to want to do so. After this stop the bus drove away to continue its route.

Three motorists observed Misty after she left the bus. All agreed that she made no indication of an intention to cross the highway while the bus was stopped. After the bus had pulled away, one of the motorists tried to "wave" Misty across the street; however, the girl declined to cross and continued to walk south on the east side of the road. The bus by this time had passed over the crest of a hill approximately 200 yards away. A pickup truck driven by Kenneth Foley was headed south on Highway 271. Misty darted onto the highway where Foley's pickup struck and killed her.

The administratrix of Misty's estate, Saundra Lindburg, brought this suit, in various capacities, against Gullion and the Mount Pleasant Independent School District. Before trial began the trial court ruled on the school district's special excep-

tions. It granted one of them and struck that portion of Lindburg's petition alleging that the school district was a common carrier of the students. It denied the other, which concerned an assertion by the school district that the suit was barred by the doctrine of sovereign immunity. After the close of evidence, the court refused Lindburg's proposed submission imposing a high degree of care on the school district and bus driver and instead submitted the case upon traditional standards of ordinary negligence.

The jury found that the driver, Gullion, was not negligent in the operation of the school bus; that Misty Lindburg had failed to maintain a proper lookout while crossing the highway; and that such failure was a proximate cause of the accident which caused her death. Based on the jury's verdict, the trial court rendered judgment that the estate of Misty Lindburg take nothing.

Lindburg appealed and argued that the trial court erred in sustaining the school district's special exception forcing Lindburg to eliminate the allegations in her petition that referred to the school district as a "common carrier." Lindburg also contended the trial court erred in failing to submit negligence issues imposing a high degree of care on the school district rather than ordinary care. The court of appeals reversed, holding that a child transported by a school bus was entitled to the same standard of care as a passenger on a common carrier, i.e., a high degree of care, and reversed the trial court. The court held the trial court erred in refusing Lindburg's instruction on this issue. 746 S.W.2d at 260. The case was remanded for a new trial.

In its motion for rehearing in the court of appeals, the school district reurged its trial court special exception concerning sovereign immunity. The court of appeals, however, held that the school district had failed to preserve the issue of sovereign immunity. The Mount Pleasant Independent School District argues that the court of appeals erred in finding the sovereign immunity issue waived. We hold the doc-

trine of sovereign immunity bars Lindburg's prosecution of this case.

## SOVEREIGN IMMUNITY

■ The court of appeals incorrectly states that no trial court ruling on the sovereign immunity contention appears in the record and thus the defense of sovereign immunity was not preserved. 746 S.W.2d at 260. The transcript reveals that before trial the trial court explicitly overruled the school district's special exception asserting sovereign immunity. Because the trial court overruled this special exception, and because it was properly raised on appeal, the defense of sovereign immunity was properly raised. Now we must ascertain the extent of the waiver of governmental immunity contained in the Texas Tort Claims Act. Tex.Civ.Prac. & Rem.Code Ann. § 101.001 et seq. (Vernon 1986 & Supp.1989).

■ Under the doctrine of sovereign immunity, the state is not liable for the torts of its agents or officers unless there is a constitutional or statutory waiver of immunity. Texas Highway Dept. v. Weber, 147 Tex. 628, 219 S.W.2d 70 (1949). By enacting the Texas Tort Claims Act in 1969, the legislature has allowed suits against a governmental unit of the state under certain circumstances. Now codified as section 101.021 of the Texas Civil Practices and Remedies Code, the Act provides:

§ 101.021. Governmental Liability

A governmental unit in the state is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

(A) the property damage, personal injury or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law. Tex.Civ.Prac. & Rem.Code Ann. § 101.021 (Vernon 1986). Although the defense of sovereign immunity has been waived by the legislature in certain instances, see, e.g., Lowe v. Texas Tech University, 540 S.W.2d 297, 298 (Tex.1976), this court must determine the limits of the waiver from the language used. Only when the legislature has clearly and explicitly waived the state's sovereign immunity may a cause of action accrue. Duhart v. State, 610 S.W.2d 740, 742–43 (Tex.1980).

■ The statute is clear that school districts may not assert the defense of sovereign immunity in cases involving the "operation or use of a motor-driven vehicle." Tex.Civ.Prac. & Rem.Code Ann. § 101.051. However, because the legislature failed to define the phrase "operation or use," it must be construed according to the ordinary meaning of the terms "operation" and "use." Satterfield v. Satterfield, 448 S.W.2d 456, 459 (Tex.1969); see also Tex.Gov't Code Ann. § 311.011 (Vernon 1988). "Operation" refers to "a doing or performing of a practical work," Jackson v. City of Corpus Christi, 484 S.W.2d 806, 809 (Tex.Civ.App.—Corpus Christi 1972, writ ref'd n.r.e.), and "use" means "to put or bring into action or service; to employ for or apply to a given purpose," Beggs v. Texas Dept. of Mental Health & Mental Retardation, 496 S.W.2d 252, 254 (Tex.Civ.App.—San Antonio 1973, writ ref'd).

In order for a claim to fall within the limited waiver of sovereign immunity, the finder of fact must determine that the damages suffered were "proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment ... [and arose] from the operation or use of a motor-driven vehicle...." Tex.Civ.Prac. & Rem.Code Ann. § 101.021. See Heyer v. North East Ind. School Dist., 730 S.W.2d 130, 131 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.). In this case no issue was requested or submitted to the jury concerning the waiver of sovereign immunity. Consequently, the jury made no finding that the

death of Misty Lindburg was proximately caused by Gullion's "operation or use of a motor-driven vehicle."

The evidence showed that the bus driver waited a few moments to allow Misty to cross the highway, but she gave no indication she wanted to do so. After she appeared to walk away from the bus, Gullion then continued on his route. The driver who ultimately struck and killed Misty Lindburg testified that he passed the school bus 100 to 200 yards from the scene of the accident. Thus, the bus was approximately one-quarter of a mile away from the actual site of the accident when it happened. Because there was no jury finding on the issue, and because the evidence does not show that as a matter of law Misty's death was caused by the "operation or use of a motor-driven vehicle," the plaintiff has waived an essential element of her cause of action. Thus, her recovery in this case is barred by sovereign immunity.

## STANDARD OF CARE

■ We now address the question of what standard of care is applicable to the operation of school buses. While the court of appeals conceded the school district was not a common carrier, it imposed upon the district the same standard of care. This was accomplished by analogizing the bus in this case to elevators and escalators in past cases. The reasoning of those cases makes them inapplicable to the facts of this case. Neither an escalator nor an elevator is a motor vehicle under the definition in the statute, § 101.021(1)(A), and thus, these cases are inapposite. The only Texas cases imposing a higher standard of care on a motor vehicle operator involve common carriers, and because the school district is not a common carrier, we do not hold it to that standard.

The court of appeals cites authorities from other jurisdictions in apparent support of its contention that those transporting children must be held to a higher standard of care. These cases are distinguishable for several reasons. In one of the cases the school contracted with the bus operator to provide transportation for the school children. *Sepulvado v. General Fire & Cas. Co.*, 146 So.2d 428 (La.Ct.App. 1962). In another the children or their families directly paid the carrier for the privilege of transport. *Lempke v. Cummings*, 253 Wis. 570, 34 N.W.2d 673 (1948). Another case cited relied on the parties' concession regarding the standard of care and cited a case involving third-party transport of school children in support of the concession. *Landry v. Travelers Indem. Co.*, 155 So.2d 102 (La.Ct.App.1963) (citing *Mire v. Lafourche Parish School Bd.*, 62 So.2d 541 (La.Ct.App.1952)). Although the court of appeals believed this was inconsequential, it is the very nature of a common carrier to be held to a higher standard of care, and in those cases the bus operator was clearly a common carrier. Three cases cited simply declare that public policy dictates school transportation be held to the same standard of care as common carriers. *Van Cleave v. Illini Coach Co.*, 344 Ill. App. 127, 100 N.E.2d 398 (1951); *Webb v. City of Seattle*, 22 Wash.2d 596, 157 P.2d 312 (1945); *Leach v. School Dist. No. 322 of Thurston County*, 197 Wash. 384, 85 P.2d 666 (1938).

The majority of jurisdictions addressing this issue have held that no heightened standard of care is imposed upon operators of school transportation. Many of these cases rely on common law precepts of the duty of care which require only the exercise of reasonable care while the children are in the school's custody. *See Johnson v. Svoboda*, 260 N.W.2d 530 (Iowa 1977); *Campbell v. Patton*, 227 Md. 125, 175 A.2d 761 (1961); *Jackson v. Hankinson*, 51 N.J. 230, 238 A.2d 685 (1968); *Settles v. Incorporated Village of Freeport*, 132 Misc.2d 240, 503 N.Y.S.2d 945 (1986); *Bridge v. Woodstock Union High School*, 127 Vt. 598, 255 A.2d 683 (1969). Many other jurisdictions imposing only a duty of ordinary care have retained the private carrier-common carrier distinction. *See Hopkins v. Yellow Cab Co.*, 114 Cal.App.2d 394, 250 P.2d 330 (1952); *Hunt v. Clifford*, 152 Conn. 540, 209 A.2d 182 (1965) (reversed by statute); *Gaudette v. McLaughlin*, 88 N.H. 368, 189 A. 872 (1937); *Archuleta v. Jacobs*, 43 N.M. 425, 94 P.2d 706 (1939); *Ar-*

*nold v. Hayslett,* 655 S.W.2d 941 (Tenn. 1983). We believe that this distinction is valid and should be retained.

■ While the policy reasons advanced by the court of appeals appear attractive at first blush, deeper considerations were actually involved in establishing a higher standard of care for common carriers. Most early cases based the decision to impose this heightened standard on the nature of the *business* of carriage. *See, e.g., Galveston City Ry. Co. v. Hewitt,* 67 Tex. 473, 3 S.W. 705 (1887). Those in the business of carrying passengers and goods who hold themselves out for hire by the public are burdened with the duties of a common carrier. *Mayhew v. McFarland,* 137 Tex. 391, 153 S.W.2d 428 (1941). The school district defendant in this case is not in the business of carriage for hire. It does not hold itself out for such purposes, nor is there any indication that it would undertake such tasks if requested to do so. The district was not created to operate a transport business. Its primary function involves the raising of tax revenues and the expenditure of funds collected to further the educational needs of the citizens within the district. The fact that children are carried in school vehicles to and from the schools of the district is only incidental to the operation of the schools. The district operates the bus service for the convenience of the pupils and not for the purpose of profit. School districts "are authorized" to undertake transport of students, Tex. Educ.Code Ann. § 21.174 (Vernon 1987), but are not required to do so. And while the school district could, with proper approval, contract to allow "nonschool organizations" to use the buses, *id.* § 21.175(b), there is no evidence before us that this was ever done. Thus, it is illogical to classify the district as a common carrier under common law notions of what that term entails.

■ The standard of care in most negligence cases is measured against the hypothetical "reasonably prudent person." There is no reason to depart from that standard in this case. The court of appeals erred in imposing a standard of care on the school district which applies only to common carriers. From the earliest days of the Republic a finding of certain qualities has been required to impose upon a party the duties of a common carrier. That the transportation is available to members of the "public generally" is the distinctive characteristic. *Chevallier v. Straham,* 2 Tex. 115, 119 (1847). There has been no suggestion that the school district would allow members of the general public to hire the bus for carriage. Moreover there is no evidence that the school children were required to furnish any type of consideration in order to be transported. While we recognize that the payment of consideration is not essential to the establishment of a passenger-common carrier relationship, *Gulf, C. & S.F. Ry. Co. v. McGown,* 65 Tex. 640 (1886), it is a factor in deciding whether such a relationship was created. We conclude the school district is not a common carrier, and thus it is held to an ordinary standard of care.

The judgment of the court of appeals is reversed, and judgment here rendered that Lindburg take nothing.

COOK, J., concurs.

MAUZY and HIGHTOWER, JJ., concur and dissent.

COOK, Justice, concurring.

The majority holds that the doctrine of sovereign immunity bars recovery because there was no jury finding that this case fell within the waiver of immunity of the Texas Tort Claims Act. Under the Tort Claims Act, we are required to interpret the phrase "operation or use of a motor-driven vehicle." Tex.Civ.Prac. & Rem.Code Ann. § 101.021(1)(A) (Vernon 1986). Although it would appear from all evidence that the accident in question arose from the operation and use of a motor-driven vehicle, there was no jury finding on this issue. The respondents have thus waived an essential element of their cause of action. I can see no difference, however, between a bus driver leaving the scene before the child crossed the road and a bus driver who simply fails to turn on the red warning lights so that a child can cross in safety,

*see Hitchcock v. Garvin,* 738 S.W.2d 34 (Tex.App.—Dallas 1987, no writ). But because there is no jury finding on this crucial element, I reluctantly concur in the result reached by the majority.

However, I believe that the Mount Pleasant Independent School District violated the ordinary standard of care applicable in this case. Misty Lindburg, a seven-year-old, got off of her school bus on the east side of U.S. Highway 271, which was across the highway from an entrance to the trailer park in which she lived. Misty walked away from the bus and into the grass on the east side of the highway. She then appeared to bend over and tie her shoe. Although it was Mount Pleasant Independent School District's policy to keep the school bus stopped until the children had safely crossed the highway, the school bus pulled away and left Misty standing on the side of the highway. When Misty attempted to cross the highway, she was struck and killed by a passing motorist.

It is important to note that we are dealing with a seven-year-old child. Clearly it might take longer for a seven-year-old to alight from a bus, tie her shoe, and cross the highway than it would for a teenager or a student in high school. Children in the elementary school grades (grades one through six) are often known to dawdle. This is nothing unusual and is to be expected. Children of this age find beauty in a flower, a rock, or things that we as adults have long since lost the ability to appreciate.

The evidence showed that the bus pulled away before Misty had crossed the highway. The duty of a school bus driver continues not only until the student has safely exited the bus, but if the student must cross the road, continues until the student has done so. *E.g., Archuleta v. Jacobs,* 43 N.M. 425, 94 P.2d 706 (N.M. 1939); *Slade v. New Hanover County Bd. of Educ.,* 10 N.C.App. 287, 178 S.E.2d 316 (1971); *Cartwright v. Graves,* 182 Tenn. 114, 184 S.W.2d 373 (1944). The bus was approximately 100 to 200 yards from the scene of the accident when Misty was killed. Thus, using standard estimates, we are talking about fifteen to thirty seconds. Is not the life of a seven-year-old child worth waiting an additional fifteen to thirty seconds?

Regarding the appropriate standard of care, the court of appeals in the instant case imposed the "highest" degree of care upon the operators of school buses. School buses are not common carriers. The majority rule imposes on school bus drivers a duty to exercise only "ordinary care." One of the reasons for this distinction is that it has been held in Texas that the higher duty of care for a common carrier terminates at the point when the passenger safely exits the common carrier vehicle. *See, e.g., Mills v. City of Dallas,* 539 S.W.2d 402, 404 (Tex.Civ.App.—Waco 1976, no writ); *Wittkower v. Dallas Ry. & Terminal Co.,* 73 S.W.2d 867, 869 (Tex.Civ.App.—El Paso 1934, writ ref'd). As stated above, however, the majority rule is that the duty owed by a school bus driver does *not* terminate at the instant a passenger has safely alighted from the bus. Thus, even if a higher duty of care were imposed, it would not be applicable in this case since Misty had already exited the bus; the bus driver would still be held to an ordinary duty of care.

Accordingly, I concur only in the result reached by the court.

HIGHTOWER, Justice, concurring and dissenting.

The majority opinion correctly interprets section 101.021 of the Texas Civil Practice and Remedies Code and applies it accurately in this case. I concur in that part of the opinion on the issue of sovereign immunity, as well as the result. Because it became unnecessary to reach the question of the standard of care applicable to the operation of school buses, I dissent from that part of the majority's opinion.

The legislative imposition of tort liability upon a school district is limited by section 101.051 of the Texas Civil Practice and Remedies Code, which excludes school districts from the Texas Tort Claims Act. Section 101.021 of the Texas Civil Practice and Remedies Code provides a statutory

exemption to the sovereign immunity doctrine that a plaintiff must allege and prove in order to bring suit against any governmental entity. The essence of the exception embodied within that section provides that a state governmental unit is liable for property damage, personal injury or death proximately caused by the intentional or negligent act of an employee acting within the scope of his employment if the property damage, personal injury or death arises from the "operation or use of a motor-driven vehicle or motor-driven equipment." Tex.Civ.Prac. & Rem.Code Ann. § 101.021(1)(A) (Vernon 1986).

The Texas Tort Claims Act does not define the words "operation" and "use"; therefore, their common and ordinary meaning should be applied. *Hopkins v. Spring Indep. School Dist.*, 736 S.W.2d 617 (Tex.1987). In the application of the ordinary meaning of these words, numerous Texas courts have held that damage or injury may arise from the use or operation of a school bus only if the use or operation of the bus is the proximate cause of the damage or injury. *Estate of Garza v. McAllen Indep. School Dist.*, 613 S.W.2d 526, 527 (Tex.Civ.App.—Beaumont 1981, writ ref'd n.r.e.); *Brantley v. City of Dallas*, 545 S.W.2d 284, 286 (Tex.Civ.App.—Amarillo 1976, writ ref'd n.r.e.); *Jackson v. City of Corpus Christi*, 484 S.W.2d 806, 809 (Tex.Civ.App.—Corpus Christi 1972, writ ref'd n.r.e.).

In the case at bar, the Texarkana Court of Appeals' opinion summarized the evidence in this fashion:

> Witnesses testified that Misty walked away from the bus without making any effort to cross the highway. The school bus drove away, and she began walking down the east side of the road toward the other entrance to the trailer park. A driver of one of the cars following the school bus stopped and attempted to wave Misty across the highway. She refused to cross at that time, but did attempt to cross after the northbound line of cars which had been stopped behind the school bus had passed. Misty was struck by a southbound pickup truck

while crossing the highway and was killed.

746 S.W.2d at 257–58.

In addition, the pickup driver testified that he passed the school bus as it was "breaking over the hill" approximately 100 to 200 yards away from the scene of the accident. The last motorist in the line of traffic behind the school bus testified that enough time had passed to allow the bus and all traffic to reach the top of the hill. Therefore, the bus was at least one-quarter mile from the scene when Misty Lindburg attempted to cross the road. Clearly, the accident in no way resulted from or was proximately caused by the "use or operation" of the school bus.

The majority's decision on the issue of governmental immunity and the statutory waiver contained in section 101.021 of the Texas Civil Practice and Remedies Code should end the inquiry. The court need not consider the standard of care to be exercised in the use or operation of a school bus to reach its conclusion. The question of what degree of care is owed is chronologically inferior to the question of whether a duty of care exists. By determining that the plaintiff cannot avail itself of the statutory waiver, the court effectively closed any question of duty of care.

Because consideration of the standard of care applicable to the operation of school buses is unnecessary to the disposition of the matters herein, I dissent from the majority's discussion of that issue.

MAUZY, Justice, concurring and dissenting.

This case involves the question of whether the standard of care owed by the operator of a school bus to a student passenger is a high degree of care or merely ordinary care and the interpretation of the phrase "operation or use of a motor-driven vehicle" as it pertains to the Texas Tort Claims Act. Tex.Civ.Prac. & Rem.Code § 101.021 (Vernon 1986 and Supp.1988). I believe that this case involved the operation or use of a school bus. I respectfully dissent because I cannot agree with the court's refusal to hold school districts to a

high degree of care in transporting children of tender years.

The court correctly points out that it was Mount Pleasant Independent School District policy that a child was not to be allowed to get off the school bus at a different stop in the afternoon unless the child had a note from the principal or his parents. The court then attempts to explain away the bus driver's failure to follow this policy by noting that Gullion transported approximately 175 students to and from school everyday and "knowing where 175 children get on and off was a difficult, if not impossible, task because of the constantly changing demographics of the bus route."

If this is true, it does not excuse Gullion's and Mount Pleasant Independent School District's negligence. Gullion testified he had fifteen years of experience as a bus driver. Gullion had been driving Misty to and from school for six weeks. If Gullion found following standard safety policies was "a difficult, if not impossible, task," he could have informed his superiors of that fact. If Mount Pleasant Independent School District has overburdened its bus drivers with more students than they can possibly manage to provide adequate care for, this is evidence of negligence, if not recklessness, and is not the kind of conduct that this court should condone.

Gullion further acknowledged at trial that it was a standard safety procedure of the Mount Pleasant Independent School District to keep his school bus stopped until all children had safely crossed the street, and that it was a standard safety procedure of the Mount Pleasant Independent School District for a bus driver to determine on which side of the highway a child lived. The court disposes of Gullion's failure to wait until Misty crossed the road by stating, "Gullion waited a sufficient length of time to allow Misty to cross the highway although she did not appear to want to do so." The court does not attempt to enlighten us as to what is "a sufficient length of time" to allow a seven year-old to cross a busy highway.

There was testimony at trial that after Misty got off the bus, she took several steps away from and to the back of the bus, and then bent over apparently to tie her shoe. When she stood up, the bus had already gone.

Significantly, the court does not address the question of why John Gullion did not ask Misty what side of the road she lived on. Misty and Jason Hinton got off the bus on the east side of the highway. Gullion testified that he knew that the house on the east side of the highway at the second bus stop was Jason Hinton's home; and that the nearest house on the east side of the highway was approximately 150 yards north of Jason's home. He further testified that, on the east side of the highway there were no homes south of Jason's home for at least one-half mile; only forest and open pastures until U.S. Highway 271 connects with an interstate highway. The north entrance to the mobile home park where Misty lived was on the west side of the highway.

Although the court holds that the Lindburgs' recovery in this case is barred by sovereign immunity, and thereby disposes of the petitioner's appeal, it goes on to address the question of what standard of care is applicable to the operation of school buses. The majority reasons that, since "there has been no suggestion that the school district will allow members of the general public to hire the bus for carriage" and "there is no evidence that the school children were required to furnish any type of consideration in order to be transported," the school district is not a common carrier, and thus is held to an ordinary standard of care.

Texas courts have extended the duty to exercise a high degree of care to carriers transporting passengers without requiring the carrier to fall strictly within the common carrier definition. For example, the high degree of care standard has been applied to elevators and escalators. *Brewer v. Otis Elevator Co.*, 422 S.W.2d 766 (Tex. App.—Houston [1st Dist.] 1967, writ ref'd n.r.e.); *Mattox v. C.R. Anthony Co.*, 326 S.W.2d 740 (Tex.App.—Beaumont 1959,

writ ref'd n.r.e.). The court correctly points out that, "neither an escalator nor an elevator is a motor vehicle under the definition of the statute, § 101.021(1)(a)," but fails to delineate the relevance of this distinction.

This case deals with a child of tender years being struck and killed by a pickup truck after being left unattended by a school district employee on the roadside of a U.S. highway. The public policy considerations involved in the transportation of children of tender years are stronger than the public policy considerations which brought about an application of the high degree of care standard being applied to elevators and escalators.

A child riding in a school bus should be entitled to the same degree of care as that exercised for the benefit of a passenger on a common carrier.[1] A school child is not in a position to negotiate a contract containing the standard of care to be required of the bus driver. The school child may not have a choice as to the mode of transportation to and from school, and the child may be required to attend school until the age of sixteen. Tex.Ed.Code Ann. § 21.032 (Vernon 1987). The mere fact that a school bus is not available as transportation for the public in general, but is limited to students in the school district, is not a reason for treating those passengers differently from the passengers on a common carrier.

Parents demand that school districts exercise the highest degree of care in providing for their child's safety. This demand is not unreasonable. I believe that our children are not only our legacy, but our society's most cherished treasure. I would hold school districts to a high standard of care in the transportation of children of tender years.

---

1. The United States Supreme Court in the case of *Indianapolis and St. Louis Railroad Co. v. Horst*, 93 U.S. (3 Otto) 291, 23 L.Ed. 898 (1876), determined that a high standard of care should be applied to a passenger accompanying his cattle on a freight train. The court stated:

> But, upon principle, why should not the law be so in this case? Life and limb are as valuable, and there is the same right to safety, in the caboose as in the palace car.... The same considerations apply to freight trains; the same dangers are common to both....

There is no reason, in the nature of things, why the passenger should not be as safe upon one as the other. With proper vigilence on the part of the carrier, he is so. The passenger has no authority upon either, except as to the personal care of himself.... The public have no choice but to use it. The standard of duty should be according to the consequences that may ensue from carelessness.

Although this case did not contrast a common carrier versus a private carrier, the same reasoning is applicable.